29 June 2000

NO. 5-99-0205

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

________________________________________________________________________

RONALD M. HENDRICKS, )  Appeal from the 

)  Circuit Court of

     Plaintiff-Appellee, )  St. Clair County.

)  

)  No. 97-L-1118A

)

RIVERWAY HARBOR SERVICE ) 

ST. LOUIS, INC., )  Honorable

)  Jerome F. Lopinot, 

     Defendant-Appellant. )  Judge, presiding.

________________________________________________________________________

JUSTICE MAAG delivered the opinion of the court:

Riverway Harbor Service St. Louis, Inc. (defendant), appeals a judgment in favor of Ronald M. Hendricks (plaintiff).  Plaintiff filed suit in St. Clair County, seeking damages for negligence under the Jones Act (46 U.S.C. §688 (1994)) and for maintenance and cure under general maritime law.  Defendant filed a timely answer in which it requested a jury trial and asserted the affirmative defense of contributory negligence.  On plaintiff's motion, the trial court denied defendant's jury demand.  A bench trial was conducted on November 9 and 10, 1998.  On November 18, 1998, the trial judge entered a judgment in favor of plaintiff for the following damages:

Medical Expenses/Cure  $37,237.26 

Maintenance      $7,452.00 

Past Impairment of Earning Capacity $0.00 

Future Impairment of Earning Capacity $0.00 

Disability/Loss of Normal Life $500,000.00 

Pain & Suffering/Past & Future 
$500,000.00

Total        $1,044,689.26

The trial court found that plaintiff was 20% contributorily negligent and reduced the awards for disability/loss of normal life and pain and suffering/past and future by 20%.  After the 20% reduction, plaintiff's award totaled $844,689.26.  It is from this judgment that defendant appeals.  On appeal, defendant contends that:  (1)  the trial court's finding that defendant was negligent was against the manifest weight of the evidence, (2) the trial court's judgment awarding separate damages for "disability/loss of normal life" and "pain and suffering" was erroneous under federal law, (3) the trial court's damages award was excessive and not based upon the evidence, and (4) the trial court erred in striking defendant's jury demand.

This case arises from an alleged injury suffered by plaintiff while working for defendant.  On June 18, 1997, plaintiff, a deckhand, was working along with Carl White, a utility man, and James Pearson, a pilot, on the towboat MV Joey Trish.  Their crew was assigned to secure barge MTI-183 to another barge.  The "other" barge was already secured to a fleet of barges sitting in the Mississippi River.

Plaintiff testified that he and White were securing the bow end of barge MTI-183 while Pearson piloted the MV Joey Trish from its wheelhouse.  Plaintiff testified that the utility man decided what technique would be used to secure a barge.  Plaintiff stated that  White chose to use the "double-eye" technique to attach barge MTI-183 in this instance.  The "double-eye" technique required a crew member to put a wire, with loops on each end, into a ratchet and then to attach it to a "cavel or timberhead."  Plaintiff testified that he slipped and fell while pulling on the ratchet to tighten the wire.  Plaintiff said that before pulling on the ratchet, he noticed some grain on barge MTI-183 but that he did not believe he was standing on grain when he began to pull on the ratchet.  After he fell, he noticed that grain was underneath him.

Plaintiff testified that at the time he fell, White was facing the other way and did not see him fall.  Plaintiff stated that immediately after falling, he asked White to wait a minute.  Plaintiff and White then proceeded to secure the bow and the stern of barge MTI-183.  After completing this task, plaintiff and White boarded the MV Joey Trish.  At that time, White noticed that plaintiff winced in pain and asked him what was wrong.  White testified that plaintiff told him "his back was bothering him".  Plaintiff went to the wheelhouse.  Pearson asked plaintiff if he wanted to fill out an accident report.  Plaintiff declined, stating that he was probably just getting old.  Although plaintiff worked the rest of the day, his back condition did not improve.  At the end of his shift, plaintiff asked Pearson to fill out an accident report.  No such report was filled out.

After his shift that day, plaintiff was picked up by his friend, Stacey Reynolds.  Stacey Reynolds testified that sometime around the date in question he picked up plaintiff from work and he noticed plaintiff was moving slowly.  When he inquired, plaintiff told Reynolds that he had injured his back "pulling on something".  Plaintiff worked the next two days, but was laid off on June 20, 1997.  Testimony revealed that plaintiff knew he was being laid off because of a decrease in defendant's business.  Plaintiff testified that he was under the impression that the layoff would only be temporary and that if defendant regained business, he would be called back.  Plaintiff acknowledged that he was not eligible for unemployment because he previously received $1,100 in overpayments on past unemployment benefits.

On June 23, 1997, plaintiff picked up his final paycheck from Richard Maynard, operations personnel manager for defendant.  At this time, plaintiff informed Maynard about his injury.  Maynard asked if anyone filled out an accident report and then referred plaintiff to BarnesCare to get his back checked out.  Dr. Patel examined plaintiff, diagnosed him with lower back pain, and recommended therapy.  Dr. Patel did not perform a CT scan or an MRI.  Plaintiff saw Dr. Patel two more times, June 30, 1997, and July 3, 1997.  Plaintiff did not appear for the last scheduled appointment on July 11, 1997.  Plaintiff claimed that he was not improving so he consulted another physician.

Plaintiff saw Dr. Schoedinger, a board-certified orthopedic surgeon, on July 21, 1997.  In the history of injury, plaintiff reported that he injured his back when he fell on some grain while pulling on a ratchet.  After an examination, Dr. Schoedinger ordered a CT scan and an MRI scan.  After reviewing the results of those scans, Dr. Schoedinger diagnosed a ruptured disc at the L5-S1 level and ordered physical therapy.  The therapy resulted in minimal improvement.  When conservative measures failed, Dr. Schoedinger operated.  Following the surgery, plaintiff noticed a decrease in his lower-back pain, but the lower-extremity pain remained the same.  Dr. Schoedinger opined that plaintiff reached maximum medical improvement after completing additional physical therapy.  He referred plaintiff for a functional-capacity evaluation.  According to the results of that evaluation, plaintiff was restricted to sedentary work.  Dr. Schoedinger testified that the residual pain in plaintiff's low back and lower extremity was a permanent condition and that no additional surgery was necessary.  Plaintiff was released from Dr. Schoedinger's care on September 2, 1998.  Plaintiff testified that he must wear a brace and use a cane to walk and cannot help around the house due to the injuries.  He also testified that the injuries adversely affected his marital relationship.

Carl White testified that he did not see plaintiff fall.  He also stated that he did not notice any grain on the barge deck.  White conceded that plaintiff could have fallen without White noticing the fall.  White stated that they did not use the "double eye" technique to tighten the wire and secure barge MTI-183 that day.  According to White, after attaching the loops, Pearson cut the engines of the towboat and allowed the barge to float with the current in order to tighten the wire.  This procedure required no jerking of the ratchet.  White stated that he uses a number of different techniques to attach barges.  He admitted that he attached multiple barges on the date of this incident.  White recalled that plaintiff had complained of back pain after they attached the stern end of barge MTI-183.  He noticed plaintiff wince in pain after barge MTI-183 was secured.  White told plaintiff to go to the wheelhouse to talk to Pearson.  Plaintiff finished the work of securing the barge and then joined them in the wheelhouse.  At that point, plaintiff told Pearson that he did not think an accident report was necessary and he was probably just getting old.  White testified plaintiff appeared in pain several more times throughout the day, and at the end of the day plaintiff requested that an accident report be filled out.  White testified that plaintiff also complained several times about his upcoming layoff. 

Jimmy Pearson testified that he did not notice plaintiff fall.  He stated that at the time of the incident he was in the wheelhouse, about 200 feet away from the area where White and plaintiff were working.  He admitted his view was obstructed.  Pearson testified that there were a number of acceptable techniques used to secure a barge.  He said that they used the technique described by White to tighten the wire on barge MTI-183 that day.  Pearson recalled that plaintiff had complained about his impending layoff that day.  He also remembered that plaintiff winced in pain after securing the barge.  Pearson testified that when plaintiff entered the wheelhouse, he asked plaintiff whether he wanted to fill out an accident report, but plaintiff declined.  Pearson testified that plaintiff worked the remainder of the shift and then came to him and asked him to fill out an accident report.  Pearson stated that he refused because plaintiff asked him to file a false report.  In his daily pilot's log, Pearson did not mention plaintiff's request for a false report or record that report of grain on the barge deck.

Mark Roach and David Morganthaler were pilots who worked with plaintiff on June 19 and 20, 1997.  Both testified that plaintiff was able to perform his duties on those days.  Plaintiff did not complain to either about back pain.  Morganthaler testified that plaintiff received his layoff notice on the morning of June 20, 1997.  Morganthaler recalled that plaintiff began to complain about being laid off and then left early.

Larry Childress, a barge maintenance manager for Alter Barge Lines, also testified.  Alter Barge Lines is the company that owned and maintained barge MTI-183.  Childress testified that barge MTI-183 last carried grain in early April 1997.  He stated that barge MTI-

183 was cleaned on April 28, 1997, and that it did not carry any grain after that cleaning.  Childress also stated that the barge was in the hands of six or seven other entities between the April cleaning and the date of the accident.

Richard Maynard, operations personnel manager for defendant, testified that he gave plaintiff his last paycheck on June 23, 1997.  At that time, plaintiff told Maynard that he had been injured on the job.  Maynard referred plaintiff to BarnesCare and requested written statements from Pearson and White.  Harold Bruner, defendant's vice president, testified that during the time of plaintiff's employment, defendant had a safety program called "River Safety Program".  According to this program, defendant was required to hold regularly scheduled safety meetings with its employees.  Bruner testified that defendant never conducted regular safety meetings.  Bruner also stated that defendant had no formal training program for its deckhands but relied upon on-the-job training.  New employees learned safety procedures from fellow employees.  Bruner also testified that defendant was responsible for all boats and barges in its possession.  He  noted that grains and other foreign substances on barge decks posed potential safety hazards for crew members.  Bruner testified that defendant had employed its own barge-cleaning crew but decided to contract out the cleaning duties five or six years prior to this incident.

Plaintiff's expert, Captain James Patrick Jamison, worked in the maritime industry for over 40 years.  He testified that defendant was negligent by:  (1) not having a fleet man inspect the barges in their possession to ensure that no foreign material was on the barge decks and (2) failing to train deckhands on alternate methods of attaching barges, aside from the "double-eye" method.  Captain Jamison testified that the "double-eye" technique exposes a deckhand to increased risk of injury because it requires him to pull on a ratchet.  His opinions were based upon assumptions that plaintiff slipped and fell on grain while pulling on a ratchet.  He stated that use of the technique described by White and Pearson was an acceptable method because it did not require the deckhand to pull on the ratchet.  He also opined that a pilot, standing in the wheelhouse of a vessel like the MV Joey Trish, would not have been able to see deckhands as they were positioned on the barge.

Defendant called Captain Ralph Stinebrook as an expert.  Stinebrook had been employed by defendant several years earlier.  Stinebrook testified it was unlikely that barge MTI-183 had grain on its deck.  Stinebrook's conclusion was based upon the testimony that the barge was cleaned on April 28, 1997, and it carried only steel prior to this incident.  He testified that the technique described by White was an acceptable method to tighten the wire because it did not require crew members to jerk on the ratchet.  He opined that conducting regular safety meetings was a good safety practice.  He also testified that other companies employ fleet men whose tasks include checking the barges for foreign materials and other unsafe working conditions.  Stinebrook admitted that at the time he worked for defendant, it employed a fleet man.  Stinebrook testified that in his experience grain could and did cause employees to slip and fall, and he opined that foreign materials on a barge deck constituted a potential safety hazard.  He also agreed that a pilot, standing in the wheelhouse of a vessel like the MV Joey Trish, would not have been able to see deckhands as they were positioned on the barge.

In its first point, defendant argues that the trial court's finding of liability under the Jones Act is against the manifest weight of the evidence because the plaintiff failed to establish that defendant was negligent.  Defendant claims that the evidence introduced at trial overwhelmingly proved that plaintiff did not slip and fall on grain while pulling on a ratchet.  At the trial, defendant theorized that plaintiff, angry over being laid off, lied about the injury in order to receive compensation and to exact revenge against defendant.  On appeal, defendant contends that plaintiff's lack of credibility and the testimony of two occurrence witnesses support its theory.

Plaintiff counters that defendant's case is premised upon the testimony of two witnesses who lack credibility and upon the speculation of a hired expert.  In his complaint, plaintiff alleged that defendant breached its nondelegable duty to provide a safe working environment in a number of ways, including failing to provide adequate means to inspect and discover foreign materials on the barge deck and permitting its employees to use the "double-

eye" method of tightening wire, which exposed them to an increased risk of injury.  Plaintiff claims that evidence introduced at the trial demonstrates that defendant was negligent in one or more of the ways claimed and justifies the trial court's findings and judgment.

In a bench trial, the trial judge weighs the evidence and makes findings of fact.  See 
Hanks v. Luhr Brothers, Inc.
, 303 Ill. App. 3d 661, 668, 707 N.E.2d 1266, 1271 (1999).  Under the applicable standard of review, we defer to the trial court's factual findings unless they are against the manifest weight of the evidence.  See 
Hanks
, 303 Ill. App. 3d at 668, 707 N.E.2d at 1271; 
Hearn v. American River Transportation Co.
, 303 Ill. App. 3d 619, 629, 707 N.E.2d 1283, 1291 (1999).  In a nonjury case, the judgment of the trial court will be upheld if there is any evidence to support it.  See 
Brown v. Zimmerman
, 18 Ill. 2d 94, 102, 163 N.E.2d 518, 523 (1959).

This case, like many involving an unwitnessed accident, rises or falls on the credibility of the witnesses.  We will not substitute our judgment for that of the trial judge as to the credibility of witnesses and conflicts in the testimony.  See 
Brown
, 18 Ill. 2d at 102, 163 N.E.2d at 523.  The trial judge, as the finder of fact, had the opportunity to see and hear each witness, to observe the demeanor of each witness, and to assess the credibility of each witness.  After weighing the evidence, the trial judge found that defendant was negligent and also that plaintiff was 20% negligent.  See 
Hearn
, 303 Ill. App. 3d at 629, 707 N.E.2d at 1291.  We have reviewed the record.  The evidence and the reasonable inferences from the evidence, if believed, support plaintiff's allegations of negligence.  See 
Hearn
, 303 Ill. App. 3d at 629, 707 N.E.2d at 1291.  Given the credibility issues and the conflicts in the evidence, we cannot say that the trial court's findings on liability and contributory negligence were against the manifest weight of the evidence.

Defendant next argues that the trial court erred in assessing separate awards for "disability/loss of normal life" and "pain and suffering".  The trial judge awarded plaintiff 

$500,000 for "disability/loss of normal life" and $500,000 for "pain and suffering".  Defendant contends that these are not separate items of damages under federal law.  The issue of what law is used to assess damages is a question of law and is reviewed 
de novo
.  See 
Hanks
, 303 Ill. App. 3d at 665, 707 N.E.2d at 1269.

This case was brought pursuant to a federal statute commonly known as the Jones Act, 46 U.S.C. §688 (1994).  State and federal courts have concurrent jurisdiction in Jones Act cases.  See 
Allen v. Norman Brothers, Inc.
, 286 Ill. App. 3d 1091, 678 N.E.2d 317, 319 (1997), citing 45 U.S.C. §56 (1988).  However, because the proper measure of damages in a Jones Act case is a substantive issue, general principles of federal law control.  See 
Monessen Southwestern Ry. Co. v. Morgan
, 486 U.S. 330, 335, 100 L. Ed. 2d 349, 357, 108 S. Ct. 1837, 1842 (1988); 
Norfolk & Western Ry. Co. v. Liepelt
, 444 U.S. 490, 493, 62 L. Ed. 2d 689, 693, 100 S. Ct. 755, 757 (1980).  Therefore, we must determine whether federal law deems "disability/loss of normal life" to be a distinct element requiring a separate damages assessment rather than an item to be included within and as a part of the element of "pain and suffering".

Based upon the briefs of the parties and our own research, it appears that there are few federal decisions which have addressed this issue.  Defendant urges us to follow the holding in 
Dugas v. Kansas City Southern Ry. Lines
, 473 F.2d 821 (5th Cir. 1973).  In 
Dugas
, the fifth circuit set aside a damages award because the damages instructions erroneously treated "loss of enjoyment of life/loss of vitality" as a separate and independent item of damages rather than a part of the element of "pain and suffering".  
Dugas
, 473 F.2d at 827.  The fifth circuit held that "loss of enjoyment of life/loss of vitality" is not a factor to be separately measured as an independent ground for damages.  
Dugas
, 473 F.2d at 827-28. 

Plaintiff asks us to consider 
Earl v. Bouchard Transportation Co.
, 917 F.2d 1320 (2d Cir. 1990).  In 
Earl
, the second circuit held that the defendant's failure to object on grounds that the damages instruction improperly separated two components of the same element was a sufficient basis to affirm the district court's judgment and award.  
Earl
, 917 F.2d at 1326.  A similar result was reached in 
Wood v. Diamond M Drilling Co.
, 691 F.2d 1165 (5th Cir. 1982), where the fifth circuit declined to reverse a damages award because defense counsel did not object to proposed damages instructions that listed "loss of enjoyment" separately from pain and suffering.  The 
Earl
 and 
Wood
 decisions amount to nothing more than an application of the waiver rule and are not particularly helpful to our analysis.  

It has long been held that in assessing an award of damages under the Jones Act, the fact-finder may consider loss of past and future earnings, and pain and suffering and inconvenience, including the effect of injuries upon the normal pursuits and pleasures of life.  See 
Chesapeake & Ohio R.R. Co. v. Carnahan
, 241 U.S. 241, 60 L. Ed. 979, 36 S. Ct. 594 (1916); 
Dugas
, 473 F.2d at 827.  The question is whether federal law deems "disability/loss of normal life" to be a distinct and independent element of damages, requiring a separate assessment.  In that regard, the Federal Pattern Jury Instructions offer some guidance. 

"Sec. 85.02  Injury, Pain, Disability, Disfigurement, Loss of Capacity for Enjoyment of Life

If you find for the plaintiff you should compensate him for any bodily injury and any resulting pain and suffering, (disability), (disfigurement), (mental anguish), (and), (loss of capacity for the enjoyment of life) experienced in the past (and which you find from the evidence that he is reasonably certain to suffer in the future from the injury in question).  No evidence of the value of such intangible things as mental or physical pain and suffering has been or need be introduced.  In that respect it is not value you are trying to determine, but an amount that will fairly compensate the plaintiff for the damages he had suffered.  There is no exact standard for fixing the compensation to be awarded on account of such elements of damage.  Any such award should be fair and just in light of the evidence."  E. Devitt & C. Blackmar, Fed. Jury Prac. & Instructions, §85.02 (4th ed. 1987).   

The fifth circuit has a similar instruction as a part of its local rules.  See Pattern Jury Instructions:  Fifth Circuit, Civil Cases, U.S. Fifth Circuit District Judges Ass'n (1999).  We also note that our colleagues in the first district, relying upon 
Dugas
, held that disability/loss of enjoyment of life is not a separate and independent ground for damages but is a factor to be considered in an award of pain and suffering under federal law.  See 
Van Holt v. National R.R. Passenger Corp.
, 283 Ill. App. 3d 62, 74-75, 669 N.E.2d 1288, 1297-98 (1996).  However, the 
Van Holt
 court merely cites the 
Dugas
 case and provides no further analysis and therefore offers little assistance toward a resolution of this issue.     

The Illinois Supreme Court faced a similar issue in 
Powers v. Illinois Central Gulf R.R. Co.
, 91 Ill. 2d 375, 438 N.E.2d 152 (1982).  In that case, the supreme court considered whether "nature, extent[,] and duration of the injury" was a separately compensable element of damages or whether it was but a factor, among others, to be considered in assessing damages.  
Powers
, 91 Ill. 2d 375, 438 N.E.2d 152.  In that case, the defendant argued that including "nature, extent[,] and duration" as a separate element of damages on the verdict form invited and directed the jury to return a separate monetary award for duplicitous and redundant elements of damages.  The supreme court held that a jury may be instructed to consider "nature, extent[,] and duration" of the plaintiff's injury as one of the elements of damages, but it may not be instructed to consider "nature, extent[,] and duration" as a separate and compensable element of damages.  The court concluded, "Thereby, duplication or overlapping of the compensable elements for which the jury is to allow damages will be avoided."  
Powers
, 91 Ill. 2d at 375, 438 N.E.2d at 156-57.

The concern over duplication and overlap in damages awards arises from the very nature of nonpecuniary loss.  There is no mathematical calculation or scientific formula by which the trier of fact can assess with precision a dollar amount to compensate for pain and suffering.  While distinctions can be made between the concepts of "pain and suffering" and "loss of normal life", these distinctions are easily blurred and may lead to a duplication of awards for the same element of damages.  See 
Powers
, 91 Ill. 2d at 379, 438 N.E.2d at 154.

After considering the available authorities, we find that under federal law, "disability/loss of enjoyment of life" is an item which may be considered as a part of the element of pain and suffering, but it is not a separate and independent element of damages.  Because this case is brought pursuant to the Jones Act, we are bound to follow the federal substantive law of damages.  See 
Liepelt
, 444 U.S. at 493, 62 L. Ed. 2d at 693, 100 S. Ct. at 757.  Therefore, we find that the trial court erred in assessing separate awards of damages for "disability/loss of normal life" and "pain and suffering".  See 
Dugas
, 473 F.2d at 827-28.  Even though this was a bench trial, we feel constrained to set aside the damages award.  Defendant is entitled to have damages measured according to clear, legally correct, plainly enunciated standards pursuant to federal law.  See 
Dugas
, 473 F.2d at 828.  That was not accomplished in this case.  In order to ensure the integrity of the judgment, we set aside the damages award and remand this case for a new trial on damages only.

Defendant also claims that the damages award is excessive and that the evidence does not support an award of this magnitude.  Since we have concluded that this case must be remanded for a new trial on damages, it is not necessary for us to consider this issue.  In this opinion we take no position on whether the award is appropriate, too high, or too low.  On retrial, we trust that the trial judge will consider the proper elements of damages in light of the evidence and will assess damages in a manner consistent with this opinion.

Finally, defendant contends that the trial court erred in striking its demand for a jury trial.  Defendant acknowledges that we have consistently and repeatedly held that Jones Act defendants do not have the right to demand a trial by jury, but defendant argues that these decisions are incorrect because (1) the Illinois Constitution (Ill. Const. 1970, art. I, §13) guarantees the right to a trial by jury, (2) section 53 of the Federal Employers' Liability Act (45 U.S.C. §53 (1994)) guarantees a Jones Act defendant the right to a trial by jury on the issue of contributory negligence, and (3) the equal protection clause of the fourteenth amendment to the United States Constitution guarantees defendant's right to a jury trial (U.S. Const., amend. XIV).  We note that these arguments are not new and can be summarily dismissed.

First, defendant argues that the Illinois Constitution grants a defendant in a Jones Act case filed in the Illinois state court the right to a trial by jury.  The Illinois Constitution guarantees the right to a trial by jury if the cause of action existed at common law.  Ill. Const. 1970, art. I, §13; see 
Martin v. Heinold Commodities, Inc.
, 163 Ill. 2d 33, 72, 643 N.E.2d 734, 753 (1994); 
Hanks
, 303 Ill. App. 3d at 665, 707 N.E.2d at 1270.  The Jones Act created a statutory cause of action that did not exist at common law.  See 
Allen
, 286 Ill. App. 3d at 1094, 678 N.E.2d at 319.  It provides seamen the right to maintain an action at law and the accompanying right to a trial by jury at the plaintiff's election.  See 
Allen
, 286 Ill. App. 3d at 1095, 678 N.E.2d at 320.  Because this cause of action was unknown at common law, the Illinois Constitution does not confer a right to a trial by jury upon a defendant in a Jones Act case.  See 
Allen
, 286 Ill. App. 3d at 1096, 678 N.E.2d at 321; 
Hanks
, 303 Ill. App. 3d at 665, 707 N.E.2d at 1271.

Defendant next argues that section 53 of the Federal Employers' Liability Act (FELA) (45 U.S.C. §53 (1994)), as incorporated in the Jones Act, gives defendant the right to demand a jury trial on the issue of contributory negligence.  The Jones Act made the provisions of the FELA applicable to seamen injured in the course of their employment.  See 
Hearn
, 303 Ill. App. 3d at 627, 707 N.E.2d at 1289.  While the Jones Act specifically provides for a jury trial at the seaman's election, the FELA does not 
expressly
 provide for a jury trial.  See 
Gibbs v. Lewis & Clark Marine, Inc.
, 298 Ill. App. 3d 743, 747, 700 N.E.2d 227, 230 (1998).  In accordance with principles of statutory construction, the more specific provision of the Jones Act controls over the more general provisions of the FELA.  See 
Hearn
, 303 Ill. App. 3d at 628, 707 N.E.2d at 1290.  Under the specific provision of the Jones Act, only the plaintiff can demand a jury trial.  46 U.S.C. §688 (1994); see 
Allen
, 286 Ill. App. 3d at 1094, 678 N.E.2d at 319.  As defendant has submitted no new arguments or authorities that demonstrate our prior holdings to be erroneous, we restate our conclusion that section 53 of the FELA confers no right upon a defendant to demand a jury trial on the issue of contributory negligence in a Jones Act case.  See 
Hearn
, 303 Ill. App. 3d at 628, 707 N.E.2d at 1290; 
Gibbs
, 298 Ill. App. 3d at 747, 700 N.E.2d at 232.

Nor does the equal protection clause of the fourteenth amendment to the United States Constitution bestow the right to a trial by jury upon a Jones Act defendant.  In order for the fourteenth amendment to be implicated, there must be some sort of "state action".  The trial court's decision to deny defendant's demand for a jury trial in this Jones Act case did not constitute a "state action".  See 
Hanks
, 303 Ill. App. 3d at 665, 707 N.E.2d at 1271.  Since there was no state action, the equal protection clause was not violated.

Accordingly, the judgment of the circuit court of St. Clair County is affirmed in part and reversed in part, and the cause is remanded for a new trial on damages only.

Affirmed in part and reversed in part; cause remanded.

HOPKINS, J., concurs.

PRESIDING JUSTICE GOLDENHERSH, specially concurring:

While I concur in the disposition and the reasoning of my colleagues in this case, I am concurring specially only on the issue that the majority in its discretion decided not to address:  the question of whether this damages award was excessive and not supported by the evidence.  While I completely agree that the damages award in this case must be reversed and the cause remanded for a retrial, the parties legitimately raised and argued the issue of whether the damages awarded by the circuit court were excessive.  An award for damages will be deemed excessive if it falls outside the range of fair and reasonable compensation or results from passion or prejudice, or if it is so large that it shocks the judicial conscience.  See 
Richardson v. Chapman
, 175 Ill. 2d 98, 113, 676 N.E.2d 621, 628 (1997); 
Richter v. Northwestern Memorial Hospital
, 177 Ill. App. 3d 247, 257, 532 N.E.2d 269, 275-76 (1988).  Defendant argues that because the trial court made separate awards for pain and suffering and loss of normal life, the total damages are duplicative and excessive.  While we hold that pain and suffering and loss of normal life should be included in one award of damages under the Jones Act, this does not necessarily mean that the 
total
 of damages awarded in this particular case was excessive.  After a review of the entire record, I would hold that the total amount of damages was not excessive as it fell within the range of fair and reasonable compensation, did not result from passion or prejudice, and was not so large that it shocked the judicial conscience.  I completely concur in the majority's position:  "[W]e trust that the trial judge will consider the proper elements of damages in light of the evidence and will assess damages in a manner consistent with this opinion" (slip op. at 13).  So as to deal with this last issue raised by the parties in the hope that resolving it would be of some guidance to the trial court on remand, and noting that the trial court is not required to award the same amount of damages, I specially concur.